# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 3, 2013

## STATE OF TENNESSEE v. OMAR BIVIANO

**Appeal from the Criminal Court for Shelby County**
**No. 11-03674    Lee V. Coffee, Judge**

---

**No. W2012-02184-CCA-R3-CD  - Filed January 16, 2014**

---

A jury convicted Omar Biviano ("the Defendant") of one count of aggravated robbery, one count of carjacking, and one count of facilitation of employing a firearm during the commission of a dangerous felony. After a hearing, the trial court sentenced the Defendant as a Range I offender to an effective term of twelve years' confinement. In this direct appeal, the Defendant contends that the evidence was not sufficient to support his convictions and that his sentence is excessive. Upon our thorough review of the record and applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments
### of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Lauren Pasley-Ward, Memphis, Tennessee, for the appellant, Omar Biviano.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Colin Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

The Defendant was charged in June 2011 with one count of aggravated robbery, one count of carjacking by force or intimidation, and one count of employing a firearm during the commission of a dangerous felony. Charged with the Defendant were Edwin Melgar and

Eric Garza.  At the Defendant's jury trial, conducted in June 2012, the following proof was adduced:[1]

Edwin Melgar, eighteen at the time of trial, testified that he was hoping to improve the disposition of the charges against him by testifying.  He described Eric Garza as a "friend."  He also described the Defendant as a "friend" and stated that, as of January 2011, he had known the Defendant for about a year.

On January 10, 2011, when Melgar was seventeen years old, the Defendant picked him up in a white Expedition SUV at about 6:00 p.m. or 7:00 p.m.  Already in the car were three other males, whom Melgar identified as Garza, "Diego," and "Daniel."  Melgar was seated in the middle of the backseat.  The men rode around for a while, and Melgar requested to be taken home.  The other men told Melgar that they were "going to do a jale."  Melgar explained that jale was a Spanish word, and it meant a "job."  Asked what kind of job the men were referring to, Melgar stated, "They were going to go look for somebody to rob."

The Defendant drove them to a part of town with which Melgar was unfamiliar.  After about ten more minutes of driving around, "they saw somebody outside in the street with a car."  Melgar stated that there were two "[m]id age" Hispanic males sitting in the car, a blue Honda.  Garza and Daniel said, "Let's get this one," and the SUV halted.  Garza and Daniel got out of the SUV and approached the Honda.  Garza and Daniel were each armed with a gun.  Garza and Daniel put their guns in the faces of the men in the Honda and told them to get out of the car and hand over their wallets.  Garza and Daniel were speaking Spanish to the men in the car.  The men got out of the Honda and handed over their wallets and the car keys.  Garza and Daniel got into the Honda and drove off.  During the carjacking, according to Melgar, the Defendant "got out and said, 'Hurry up'" in Spanish.

After Garza and Daniel drove off, the Defendant drove Melgar and the remaining passenger to "Dopey's" house.  Melgar received forty dollars from the robbery.

Shown a photograph with a person circled, Melgar identified the circled person as the Defendant.

On cross-examination, Melgar stated that he decided to become a witness for the State about ten days before trial "because it seemed better for [him] to do that."  He stated that the State had not made him any promises, but he was hoping for a "better disposition" of his case. He acknowledged that one of the victims had identified him in person at a hearing in

_____

[1] Only the Defendant was on trial.

February 2011 as looking like the driver of the SUV. He admitted that he did not object when the other people in the SUV said they wanted to do a "jale." He stated that Daniel and Diego were next to him in the backseat of the SUV. The Defendant was driving, and Garza was in the front passenger seat. The SUV pulled up perpendicular to the passenger side of the Honda with the SUV's driver's door close to the Honda's passenger door. Garza got out and went to the driver's side of the Honda. Daniel went to the passenger side of the Honda. Melgar could see the faces of the men in the Honda. He said that the men in the Honda could not see him because the SUV's windows were tinted.

When Melgar got to Dopey's house, he saw "maybe three" other people there. He asked a female there to give him a ride home, which she did. Melgar returned to Dopey's house the next day, where he was arrested. There were "[a]bout ten" people there at the time, including the Defendant, Garza, Daniel, and Diego. At the time of his arrest, Melgar was playing Xbox. The other people were smoking marijuana, but he was not. When the police arrived, they knocked on the door. At that point, Melgar testified, "[e]verybody started trying to run and hide stuff." When the police officers came in, Melgar was sitting on the sofa. The officers arrested him because, he thought, of "the marijuana smoke thing." After he was taken to the police station, and after his mother arrived, they began asking him about the robbery. He decided to tell them about it because "[t]hat's something big."

On redirect examination, Melgar stated that he did not get out of the SUV during the carjacking.

Jose Gomez, twenty-nine years old at the time of trial, testified[2] that he and his long-time friend, Abigael Esqueda, were robbed outside Gomez's house on January 10, 2011. It was between 6:00 p.m. and 8:00 p.m. The robbery occurred near the parking lot of his residence. The street lighting was working. He was in the passenger seat of a blue Honda when a man approached him and aimed a pistol at him. Gomez got out of the car, afraid he was going to die. Esqueda was in the driver's seat. The gunman asked for Gomez's bag, and Gomez gave it to him. There was $600 cash in the bag. Gomez asked for his identifications, and the gunman took them and threw them on the ground. Gomez and the gunman were speaking Spanish. Gomez also gave the gunman his cell phone. Gomez later recovered his cell phone.

While Gomez was being accosted, another gunman was "doing the same" to Esqueda. After Esqueda also got out of the car, the two gunmen took the car. The gunmen came from a white Ford Expedition. Gomez could see another person in the Ford "by the steering wheel" but could not see anyone else. He said the Ford was two to two-and-a-half meters

_____

[2] Gomez, who spoke Spanish, testified through an interpreter.

-3-

from the Honda. He did not see the driver of the Ford get out. He heard a voice from the Ford tell the gunmen to hurry up. The voice came from the Ford's driver's side. Gomez added, "he sort of stuck his head out a little bit, but I didn't really get a good look." Gomez was "concentrating on the one who was aiming a pistol at [him]." Gomez stated that the man stuck his head out from the driver's seat.

Gomez stated that the men who robbed him and Esqueda were covering their faces, one with a dark bandana and the other with a combination of his hood and his hand.

Four or five days later, Gomez was shown some photographic line-ups, and he pointed someone out. However, he was not one hundred percent sure of his identification. On that same day, Gomez's cell phone was returned to him. He later discovered videos on it. The videos had not been on the phone prior to the robbery, and he did not recognize anyone in the videos. When he showed the videos to Esqueda, Esqueda recognized someone. After he and Esqueda viewed the video, Gomez turned the phone back over to the police. When shown the photograph that previously had been shown to Melgar, and which Melgar testified depicted the Defendant with a circle drawn around him, Gomez testified that the photograph was from the video. Gomez testified that he did not recognize the person who was circled and that Esqueda drew the circle around the person.

On cross-examination, Gomez explained that he identified "G-4" from the photo spreads as the man that held the gun on him, but he was not certain of his identification. He was not able to identify the driver of the SUV. He stated that the driver's window of the SUV was rolled down.

Abigael Esqueda, twenty-three years old at the time of trial, testified[3] that he and Gomez had been friends before coming to this country from Mexico. He stated that, on January 10, 2011, at approximately 8:00 p.m., he was robbed near a friend's house. Gomez was with him at the time. Esqueda was sitting in the driver's seat of his Honda, and Gomez was sitting in the passenger seat. A white Expedition pulled up, "catty-corner." Two men got out of the Expedition and approached the Honda, waving pistols. The men spoke Spanish to them. Esqueda testified, "[W]hen they had pointed the pistols at us, we got our wallets out and he got my cell phone and took my car." Esqueda stated that he was "scared." The episode lasted about four minutes. The two assailants got in the Honda and left. According to Esqueda, the driver of the Expedition never got out of that vehicle. Esqueda heard the driver say, "they needed to hurry up, they needed to move it."

---

[3] Esqueda, who spoke Spanish, testified through an interpreter.

-4-

Esqueda reviewed photographs with the police on January 13, 2011. He identified the photograph marked C-5 and indicated on the Advice to Witness Viewing Photographic Display that the individual was involved in the crime. Esqueda identified at trial the photographic array that he viewed with the police and on which he circled the photograph labeled C-5. Underneath the circled photograph, Esqueda wrote "this is the one I thought I recognized when he was driving." The page containing the photograph labeled C-5 was admitted as Exhibit 2. Later testimony by another witness established that C-5 was a photograph of Melgar. Asked why he circled the photograph, Esqueda responded, "I thought I recognized it while he was driving, but they – but I really wasn't positive. Didn't have that much chance."

Esqueda also identified at trial the still photograph captured from the video discovered on Gomez's phone. Esqueda explained that, after Gomez retrieved his cell phone from the police, Esqueda looked at the videos on it. He testified that, after seeing the videos, he thought "that he was the one who was driving by – on account of his coat." On January 17, 2011, he circled a person wearing a light-colored hooded jacket depicted in the still photograph and wrote, "This person is the one who was driving when they stole the white Expedition [sic] and shouted to them to move it and get the money." This photograph was admitted as Exhibit 3. Asked to explain why he identified two different persons as the driver of the Expedition, Esqueda responded, "On account of the coat that he was wearing when we saw him."

On cross-examination, Esqueda acknowledged having testified at the juvenile court hearing. There, he identified Melgar in person as the driver of the SUV. He acknowledged having identified Melgar twice as the driver of the Expedition. Asked, "So would it be fair to say, Mr. Esqueda, that you don't know who was the driver of the car?", Esqueda responded, "Well, it seems to me that it was more the one that – it seems to me more that he was the one in the large photo."[4] When defense counsel then referred to the Defendant's image in Exhibit 3 and asked again about the basis of Esqueda's identification of the Defendant as the driver, Esqueda responded that it was "because of the coat."

On redirect examination, the writing on Exhibit 3, which Esqueda wrote in Spanish, was translated as, "This person is the one who was driving when they robbed – was driving the Expe – the white Expedition when they robbed me. And he was shouting that – that they

_____

[4] Exhibit 2, on which Esqueda circled the photograph labeled C-5, is a letter-sized page containing six photographs. Exhibit 3, on which Esqueda circled a photograph of the Defendant, is a letter-sized page. Thus, the record indicates that the "little photograph" was the one contained in Exhibit 2 and that the "large photo" was Exhibit 3.

take our money – that they take our money from us."  Additionally, the following colloquy transpired:

> Q.  Do you recall being in Court about ten days or two weeks ago for a hearing with the same lawyers and the same judge?[5]
>
> A.  Yes.
>
> Q.  Do you recall making a statement in regard to this picture [Exhibit 3], that this looks like the driver but you can't be a hundred percent (100%) positive? Do you recall making that statement?
>
> . . .
>
> A.  Yes.
>
> Q.  Two weeks ago, you even pointed to somebody in the Courtroom; do you remember doing that?
>
> A.  Yes.
>
> Q.  Who did you point to?
>
> A.  To the one sitting there – seated there.
>
> Q.  Why?
>
> A.  Because of the – because of the forehead here a little bit because of his skin, like the one who robbed me.

The transcript of the suppression hearing indicates that, there, Esqueda identified the Defendant when asked if he recognized anybody that day that robbed him.  Thus, the record before this Court indicates that, at trial, Esqueda was indicating the Defendant as "the one sitting there – seated there."[6]

---

[5] The record reflects that a motion to suppress hearing was held on May 30, 2012, at which Esqueda testified about the photograph admitted as Exhibit 3 at trial.

[6] The Defendant also indicates in his brief that Esqueda identified him at trial "because of the forehead here a little bit because of his skin, like the one who robbed [him]."

Officer Daniel Washington of the Memphis Police Department ("MPD") located the blue Honda on January 11, 2011, at an apartment complex. He had it towed to the city lot for processing. Officer Christopher Slaughter of the MPD processed the blue Honda and collected "quite a few" sets of fingerprints.

Officer Brian Beasley of the MPD testified that he was the case officer assigned to this matter. A call made on one of the stolen cell phones led officers to an address on Monaco. At least ten officers responded at about 8:00 p.m. on January 11, 2011. When they arrived, Officer Beasley knocked on the front door. Someone looked out the window and there was then "a lot of commotion on the interior of the house." A man identifying himself as Alonzo Corona answered the door, and "when he exited the house, he was accompanied by a – a large plume of marijuana smoke." At that, Officer Beasley detained Mr. Corona, entered the house, and detained all of the occupants. The officers "arrested everybody." Officer Beasley clarified that they arrested ten persons, nine of them Hispanic males who matched the general description of the men involved in the carjacking, including the Defendant. A search warrant subsequently was obtained for the house.

As Officer Beasley was looking through the house for other suspects, he "looked into a closet and there was a cell phone that matched the description of the cell phone that was taken from Mr. Esqueda." Officer Beasley asked another officer to call Esqueda's number, and the cell phone that Officer Beasley found rang.

Of the nine males arrested, three were charged with the instant crimes, including Melgar because "[h]e confessed, and later he was picked out of a photo identification." Garza also confessed and was charged.

Initially, the Defendant was transported to juvenile court for the drug charges. He was later implicated by Melgar and Garza as participating in the carjacking.

On January 14, 2011, Gomez and Esqueda came to the police station and provided statements. They also were shown photographic arrays. At that time, Gomez "made one misidentification of just a random filler picture that was not one of the persons implicated in the robbery." This "filler picture" was labeled "G-4." Officer Beasley testified that Esqueda looked at a total of fifty-four photographs. Esqueda circled only one of the photographs, a photograph of Melgar. Officer Beasley added that Melgar was one of the ten persons arrested at the residence on Monaco.

Officer Beasley returned the cell phones that had been recovered at the house on Monaco to the victims. Later, a friend of the victims called him and told him "that there was a video that had been taken on Gomez's cell phone, and on that cell phone was a video of the person that Esqueda said robbed him." Officer Beasley obtained the cell phone, watched the

video, and printed off some still photographs from it. On January 17, he showed the still photographs to the victims, "and Esqueda circled the person and said, 'This is who I'm talking about. This is one of the persons that robbed me.'"

Officer Beasley explained that he requested the blue Honda to be dusted for fingerprints, and he stated that prints were collected. None of the prints matched the Defendant.

On cross-examination, Officer Beasley acknowledged that neither he nor any of his officers interviewed the Defendant before the Defendant was transported to juvenile court or thereafter. Officer Beasley also stated that he recognized the Defendant when he viewed the video taken with Gomez's phone. After Esqueda watched the video and identified the Defendant as one of the participants in the robbery, Officer Beasley determined that there was sufficient evidence to charge the Defendant with the instant crimes.

Officer Beasley acknowledged that the Defendant's photograph was in the photo arrays shown to the victims on January 13 and that neither of the victims identified that photograph.

In response to a question posed by the jury and asked by the trial court, Officer Beasley testified that there was no physical evidence recovered from the Honda that was linked to the Defendant or the codefendants.

Officer Lee Walker of the MPD responded to the residence on Monaco during the early morning hours of January 12, 2011, "to photograph and collect evidence on a warrant." There, he recovered a nine-millimeter pistol and magazine from a bed cover in one of the bedrooms. He also recovered a SIG forty caliber handgun and magazine from a recliner chair in the back bedroom. He also collected a bullet-proof vest from a closet in one of the bedrooms.

The State rested its case, and the defense presented no proof. After deliberating, the jury convicted the Defendant of aggravated robbery, carjacking by force or intimidation, and facilitation of employment of a firearm during the commission of carjacking. After a sentencing hearing, the trial court sentenced the Defendant as a Range I offender to twelve years for the aggravated robbery, twelve years for the carjacking, and four years for the firearm offense, all to be served concurrently in the Tennessee Department of Correction, for an effective sentence of twelve years' incarceration. In this direct appeal, the Defendant contends that the evidence was not sufficient to support his convictions and that his sentence is excessive.

## Analysis

### Sufficiency of the Evidence

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

As set forth above, the Defendant was convicted of aggravated robbery, carjacking by force or intimidation, and facilitation of employing a firearm during the commission of a felony. As charged in this case, aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," Tenn. Code Ann. § 39-13-401(a) (2010), "[a]ccomplished with a deadly weapon." Id. § 39-13-402(a)(1) (2010). Carjacking "is the intentional or knowing taking of a motor vehicle from the possession of another by use of . . . [f]orce or intimidation." Id. § 39-13-404(a)(2) (2010). As to the third offense, "[i]t is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." Id. § 39-17-1324(b)(1) (2010). Carjacking is a "dangerous felony." Id. § 39-17-1324(i)(1)(D).

Additionally, "[a] person is criminally responsible for an offense committed by the conduct of another, if: . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2) (2010).

"A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under [Tennessee Code Annotated] section 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Id. § 39-11-403(a) (2010).

The Defendant does not contend that the State failed to prove one or more of the elements constituting these crimes. Rather, he contends that the evidence was not sufficient to establish his identity as one of the perpetrators of the crimes committed against the victims. The State disagrees.

Melgar testified that the Defendant drove the Expedition in a quest to find potential robbery victims. When two of the Defendant's cohorts saw the victims and said, "let's get this one," the Defendant drove the Expedition up to the blue Honda and stopped. Garza and Daniel got out, accosted the two victims with handguns, and demanded the victims' wallets and car keys. When the Defendant perceived that events were not proceeding swiftly enough, he yelled at Garza and Daniel to hurry up. The Defendant waited until Garza and Daniel completed the robbery and carjacking and drove off in the Honda before he drove away from the scene.

Melgar's testimony about the Defendant's participation in the aggravated robbery and carjacking unequivocally identified the Defendant as a perpetrator. However, Melgar was also charged with these crimes. In Tennessee, a defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). Rather,

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

Bigbee, 885 S.W.2d at 803 (citations omitted). It is for the jury to determine whether sufficient corroboration exists. Id.

We hold that there was sufficient corroborating evidence to support Melgar's identification of the Defendant as a participant in the instant crimes. Gomez testified that, after his cell phone was stolen, it was returned to him containing a video that had not been on it at the time it was stolen. When Gomez showed the video to Esqueda, Esqueda recognized one of the people shown in the video as one of the perpetrators. Esqueda subsequently identified the Defendant from a still photograph obtained from the video. At trial, Esqueda maintained his earlier identifications of the Defendant. The proof at trial established that Esqueda had a sufficient opportunity to see the Defendant during the crimes because the SUV was pulled up to the Honda, the driver's window was down, and there was sufficient lighting to see.

We acknowledge that this proof was not overwhelming. However, "it need not be." Shaw, 37 S.W.3d at 903. The corroborating proof was sufficient to support the jury's determination that it fairly and legitimately tended to connect the Defendant with the commission of the instant crimes. See id. The Defendant's arguments about inconsistencies in the evidence and Melgar's self-interest go to the weight of the evidence, a matter entrusted to the jury. See id. "Our role is simply to determine whether the evidence was sufficient to corroborate the accomplice's testimony and legally sufficient for any trier of fact to have found the essential elements of the offense beyond a reasonable doubt." Id. at 903-04. We hold that it was. Accordingly, the Defendant is not entitled to relief from any of his convictions on his claim of insufficient evidence.

*Sentencing*

After a sentencing hearing, the trial court determined that the Defendant was seventeen years old at the time he committed the instant offenses and that he was a Range I offender. The trial court applied as enhancement factors the Defendant's previous history of criminal convictions or behavior; that he was a leader in the commission of the offenses; that he had earlier been adjudicated to have committed delinquent acts as a juvenile that would have been felonies had he committed the acts as an adult; and, as to the carjacking conviction, that he possessed or employed a firearm during the commission of that offense. See Tenn. Code Ann. § 40-35-114(1), (2), (16), (9) (2010). In mitigation, the trial court gave "some weight" to the fact that the Defendant "grew up in a household that was replete with domestic violence; that he tried to help his mother when his mother was being beaten by his father, and [that] he was in fact expelled from his house at the age of 12 while trying to help his mother." See id. § 40-35-113(13) (2010). After applying these enhancement and mitigating factors, the trial court sentenced the Defendant to the maximum Range I sentence

of twelve years for the aggravated robbery, a Class B felony;[7] the maximum Range I sentence of twelve years for the carjacking, a Class B felony;[8] and the maximum Range I sentence of four years for the facilitation of the firearm offense, a Class D felony.[9]  See id. § 40-35-112(a)(2), (a)(4) (2010).  The Defendant now complains that the trial court erred in applying the first two of the four enhancement factors.  The Defendant also contends that the trial court erred in failing "to give proper weight to the mitigation."

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The referenced "principles of sentencing" include the following:  "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs."  Tenn. Code Ann. § 40-35-102(1), (3)(C) (2010).  "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of

---

[7] Tenn. Code Ann. § 39-13-402(b).

[8] Tenn. Code Ann. § 39-13-404(b).

[9] Tenn. Code Ann. §§ 39-17-1324(h); 39-11-403(b).

-12-

potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2010).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at

709.  This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  Id. at 709-10.  Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result.  See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008).  The party appealing the sentence has the burden of demonstrating its impropriety.  Tenn. Code Ann. § 40-35-401 (2010), Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

As to the first challenged enhancement factor, the Defendant contends that his juvenile record "cannot be used to prove a previous history of criminal convictions or behavior."  We agree.  Our supreme court has indicated that Tennessee Code Annotated section 40-35-114(1) "appl[ies] only to adult criminal conduct."  State v. Jackson, 60 S.W.3d 738, 742 (Tenn. 2001).  The trial court erred when it determined that enhancement factor (1) could be applied to the Defendant's sentences.

We do not agree that the trial court erred by considering the enhancement factor that the Defendant was a leader in the commission of the offenses.  The trial court had before it sufficient proof from which to determine that the Defendant drove his cohorts around with the goal of robbing someone; that he stopped when they spotted a target and pulled up to the targeted vehicle; that he ordered his cohorts to "hurry up" during their commission of the offenses; and that he waited until his cohorts were successful in the carjacking offense before driving away from the scene.  These circumstances support application of this enhancement factor.  See State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993) ("Our cases have established that enhancement for being a leader in the commission of an offense does not require that the defendant be the sole leader but only that he be 'a' leader.") (citation omitted).

As to the Defendant's argument that the trial court failed to give "proper weight" to the proof of mitigation, our standard of review set forth above makes clear that this is not a basis upon which this Court may grant relief.  Moreover, our conclusion that the trial court erred in its application of enhancement factor (1) does not entitle the Defendant to relief.  As set forth above, "a trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision."  Bise, 380 S.W.3d at 709.  Because the Defendant's sentences are within the appropriate range, and because the record demonstrates that the Defendant's sentences are otherwise in compliance with the purposes and principles set forth in the Sentencing Act, we affirm the Defendant's sentences.  See id. at 709-10.

## Conclusion

For the reasons set forth above, we affirm the Defendant's convictions and sentences.


_____

JEFFREY S. BIVINS, JUDGE